IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

| | |
|---|---|
| BURROUGHS DIESEL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action Number: 2:18-cv-48-KS-MTP |
| | ) |
| THE TRAVELERS INDEMNITY | ) |
| COMPANY OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

**THE TRAVELERS INDEMNITY COMPANY OF AMERICA'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE TESTIMONY OF BURROUGHS DIESEL, INC.'S EXPERTS DR. FERNANDO LORENZO AND MR. J. ROGER CRADDOCK**

COMES NOW Defendant The Travelers Indemnity Company of America ("TIA") and, in support of its Motion to Exclude certain conclusions of Dr. Fernando Lorenzo's ("Lorenzo") and Mr. J. Rogers Craddock's ("Craddock") testimony, submitted on behalf of Plaintiff Burroughs Diesel, Inc. ("Burroughs"), states as follows:

**I.      Introduction.**

TIA seeks to strike the following expert opinions pursuant to *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579,591 (1993):

- Lorenzo's opinion that the HCL vapor constitutes "smoke."[1]

- Lorenzo's opinion that the painted side panels of all of the Burroughs buildings have lost 50% of their life; and

- Lorenzo's opinion that the metal roofs have lost 80% of their useful life.

---

[1] Craddock testified that the decision to identify the HCL vapor as "smoke" in the reports was made by Lorenzo. As a result, because Lorenzo's opinion that regard is unreliable, neither he nor Craddock are able to opine that the HCL vapor was "smoke." [Ex. "EE," p.135:9-15]].

1

These opinions are due to be struck because the opinions and/or findings are not based on sufficient facts or data, are not the product of reliable principles or methods, and neither Lorenzo nor Craddock is qualified to offer said opinions.

## II. Standard for Determining Whether Expert Testimony is Permissible.

Expert testimony is admissible if it "(1) will assist the trier of fact to understand the evidence or to determine a fact in issue; (2) the witness is qualified; (3) the testimony is based upon sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The trial judge is responsible for ensuring that "an expert is properly qualified, and that his testimony is both reliable and relevant." *B&B Construction & Equipment, LLC v. Ovella*, 2013 WL 12123363, at *1 (S.D. Miss. July 22, 2013) (citing *Curtis v. M&S Petroleum, Inc.,* 174 F.3d 661, 668 (5th Cir. 1999) (further citations omitted)).

In addition, the proponent of the expert testimony must prove reliability, qualifications, and relevance "by a preponderance of the evidence." *See Lewis v. Kinder Morgan Southeast Terminals, LLC*, 2008 WL 3287219, at *3 (S.D. Miss. Aug. 7, 2008) (citing *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)); *see also Bryant v. 3M Co.*, 78 F. Supp. 3d 626, 630, 633 (S.D. Miss. 2015) (citing *United States v. Griffith*, 118 F.3d 318, 322 (5th Cir. 1997)); and *Johnson v. Arkema, Inc.* 685 F.3d 452, 459 (5th Cir. 2012).

The Court determines an expert's reliability by "assessing whether the reasoning or methodology of the underlying testimony is scientifically valid." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007); *see also Ovella*, 2013 WL 12123363, at *1

(citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). Moreover, expert testimony "must be reliable at each and every step, or it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Seaman v. Seacor Marine LLC*, 326 Fed. App'x 721, 725 (5th Cir. 2009) (alteration original). "Therefore, '[w]here an expert's opinion is based on insufficient information, the analysis is unreliable." *Bryant,* 78 F. Supp. 3d at 632.

In addition, the Fifth Circuit warns against an expert's testimony "leaping from an accepted scientific premise to an unsupported one." *Moore*, 151 F.3d at 279 (citing *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (further citations omitted)). This same court held "[t]o support a conclusion based on such reasoning, the extrapolation or leap from one . . . to another must be reasonable and scientifically valid." *Moore,* 151 F.3d at 279 (citing *Daubert,* 43 F.3d at 1319-20) (further citation omitted).

"An expert witness's testimony should be excluded if the district court 'finds that the witness is not qualified to testify in a particular field or on a given subject.'" *Williams v. Manitowoc Cranes, LLC*, 2016 WL 7670061, at *3 (S.D. Miss Sept. 21, 2016) (citing *Carlson v. Bioremedi Therapeutic Sys., Inc.* 822 F.3d 194, 199 (5th Cir. 2016) (further quotation omitted)). Courts hold that a proponent must show that the expert has "*particular* expertise, not *potential* expertise[.]" *Lee v. Nat'l R.R. Passenger Corp. (Amtrak)*, 2012 WL 92363, at *3 (S. D. Miss. 2012) (distinguishing between a social worker's expertise in treating PTSD and diagnosing PTSD) (emphasis added); *see also Bryant*, 78 F. Supp. 3d at 631 (an expert's "'specialized knowledge', must be 'sufficiently related to the issues and evidence'" of the case so that the

testimony will assist "'the trier of fact'") (quotation omitted).  As such, "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."  *Moore,* 151 F. 3d at 278 (quotation and citations omitted)).

An expert's testimony is not relevant if it does not "assist the trier of fact to understand the evidence or determine a fact in issue."  *Pipitone v. Biomatrix, inc.*, 288 F.3d 239, 245 (5th Cri. 2002) (quoting *Daubert*, 509 U.S. at 591).  "Relevance depends upon whether [the expert's] reasoning or methodology properly can be applied to the facts at issue.  *State Automobile Mut. Ins. Co. v. Freehold Management, Inc.*, 2019 WL 1436659, at *4 (N.D. Tex. Mar. 31, 2019) (quoting *Knight*, 482 F.3d at 352).

### III.   The Expert Opinions.

#### A.   Lorenzo's opinion that HCL vapor is "smoke" is unreliable, speculative, and not based on any expertise, experience, or research.

Burroughs identified Lorenzo as an expert in the fields of "engineering, mechanical engineering and in the field of metallurgy."  [Ex. "II," p. 2].  In his expert report, Lorenzo described the HCL release as a "smoke/vapor" without providing any explanation of how he arrived at the conclusion that HCL vapor can be classified as "smoke."  [Ex. "CC," pp. 3-4]. However, Lorenzo's opinion that the HCL vapor is "smoke" is not based on any particular expertise he possesses, any personal experience, or any scientific research.  Rather, it is mere conjecture.

Lorenzo admitted that he has never investigated or opined as to whether a liquid vapor

was "smoke" before this case.[2] [Ex. "BB," p. 75: 5-8; *see also* pp. 75:23-76: 1]. He also testified that he performed no research, scientific or otherwise, on the issue of what constitutes "smoke." [Ex. "BB," pp. 76: 15-77:5].

Likewise, Lorenzo's designation an expert engineer and metallurgist, in and of itself, does not qualify him to offer the opinion that liquid vapor constitutes "smoke." *See Lee v. Jackson Cty. Miss.*, 2017 WL 53952, at *9 (S.D. Miss. Jan 3., 2017) (a nursing expert is not qualified to testify as to medical causation); *see also Wilson v. Woods*, 163 F. 3d 935, 937 (5th Cir. 1999) (a mechanical engineer with no experience in the field of automobile accident reconstruction was not qualified to testify as an accident reconstructionist); *Pennington v. UPS Ground Freight, Inc.*, 2018 WL 1881258, at *1 (N.D. Miss. Apr. 19, 2018) (commercial truck driver is not qualified to testify as an expert as to regulations and guidelines for commercial truck driving); and *Na'tl R.R. Passenger Corp. (Amtrak)*, 2012 WL 92363, at *3 (expert must show that they have particular expertise in the area to which they are testifying, not potential expertise).

Because Lorenzo, as a metallurgist, does not have the background or personal experience sufficient to establish his expertise, and performed no research on the issue, his opinion that the HCL vapor at issue is "smoke" is pure speculation and conjecture. *See Beck v. Koppers,* 2006 WL 2135546, at *3 (N.D. Miss. July 26, 2006) (An expert's opinion "must be excluded if based on speculation or conjecture.") (citations omitted). Thus, Dr. Lorenzo's opinion is unreliable, unsupported by any scientific research, and cannot be applied to the facts of this case. *See Freehold Management, Inc.*, 2019 WL 1436659, at *4. As such, Lorenzo's "smoke" opinions and findings are due to be stricken.

---

[2]Lorenzo's only experience with "smoke" was working cases with Craddock with "some of them

### B. Lorenzo's opinion regarding the roofs' loss of useful life is due to be struck because it is speculative and not based on any actual observation or testing of the alleged extent of damage.

In his expert report, Lorenzo posited that the metal roofs of the Burroughs buildings had lost 50% of their useful life because the protective zinc galvanization had been corroded by the HCL vapor. [Ex. "CC," pp.12-13]. At his deposition, acknowledging he made several errors in his report, he changed his opinion to state that the roofs instead lost 80% of their useful life. [Ex. "BB," p. 112:22-24]. However, Lorenzo's deposition revealed that the basis of his investigation that led him to that opinion was grossly inadequate.

In his deposition, Dr. Lorenzo admitted that he does not know what type of metal is on any of the Burroughs roofs. Moreover, he does know the thickness of any zinc galvanization on any of the Burroughs' roofs, yet he has opined as to the degree of corrosion of that same zinc coating. (G60). [Ex. "BB," p. 111: 3-20]. The simple fact that he does not know the original thickness of the same zinc coating that he claims has been corroded establishes that his entire opinion is mere conjecture.

Moreover, he admitted that he had never inspected or even seen the roofs despite being at the facility as late as March 2019. [Ex. "BB," p. 119:17-23]. He also admitted that he had never done any testing on any section of the roofs to determine the degree of corrosion, or the remaining thickness of the galvanized coating, despite having the capability to perform such tests. [Ex. "BB," pp. 183:24-184:6].

Finally, in arriving at his extrapolation as to the coverage and concentration of the HCL that he opines would have contacted the Burroughs roofs, he relies on incomplete data.

---

turning into fires." [Ex. "BB," p. 75:11-14].

Specifically, he testified that when using other engineer's test results for pH and chloride sampling, the specific location of any test sampling is an important piece of the puzzle; however, he conceded that he does not know the specific locations where the pH and/or chloride test samples originated that generated the results upon which he relied. [Ex. "BB," p. 137:12-17]. Dr. Lorenzo also agreed that none of the roof tests showed a pH of 1 and, in order to arrive at his calculation of loss of useful life, he had to use a pH test result that was, admittedly, "not found . . . from a roof sample." [Ex. "BB," p. 181:9-11; *see also* p. 181:19-22]. Dr. Lorenzo, ignoring all of the other roof pH test results, instead chose to rely on a single pH test result taken from the ice machine on the ground. From there, he extrapolated a calculation that led him to his opinion as to the loss of useful life of the roof panels. Dr. Lorenzo's method was not a scientifically reliable methodology for determining the coverage and concentration of the HCL that he opines would have contacted the Burroughs roofs.

 Finally, despite also admitting that knowing the amount of chlorides present at a particular sampling location would be important, Lorenzo admitted that he has no idea "how much" chloride was found at any of the sampling locations, which would indicate the rate and degree of corrosion on the roofs. [Ex. "BB," pp. 239:17-240:24].

 In short, Lorenzo calculates the loss of useful life as to the roofs without knowing how much galvanized zinc was on the roofs, without using any of the actual pH results taken from the roofs themselves, and without knowledge of how much acid attacked the roofs. Dr. Lorenzo's methodology is based on pure speculation and insufficient facts; and therefore, his conclusion that the buildings lost 80% of the useful light should be excluded because his methodology is based on assumptions that make his analysis unreliable. *See Beck v. Koppers,* 2006 WL

2135546, at *3 (N.D. Miss. July 26, 2006) (An expert's opinion "must be excluded if based on speculation or conjecture." ) (citations omitted); *see also Paz v. Bush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("Where an expert's opinion is based on insufficient information, the analysis is unreliable.") (citation omitted); *Cooper v. Meritor*, 2019 WL 545187, at *27 (expert testimony that is "'imprecise and unspecific or whose factual basis is not adequately explained'" should be excluded') (quotations omitted); and *Bryant,* 78 F. Supp. 3d at 632.

Dr. Lorenzo's opinion that the roofs on the Burroughs buildings have lost 80% of their useful life is not based on any scientific treatise or methodology, or his personal experience. As a result, his opinion is unreliable. Dr. Lorenzo's own testimony establishes that the opinion is not grounded in the methods or procedures of science, but rather is exactly the kind of unsupported speculation or subjective belief that should be stricken.  *See Freehold Management, Inc.*, 2019 WL 1436659, at *4.  As such, Dr. Lorenzo's opinion regarding the roofs' loss of useful life is due to be stricken.

> **C.     Dr. Lorenzo's Testimony that all of the painted side panels of the Burroughs's buildings have lost 50% of their useful life is due to be struck because it is speculative and not based on any acceptable scientific methodology or research.**

In his expert report, Dr. Lorenzo posited that the side panels of the Burroughs buildings have lost 50% of their useful life because the HCL would have corroded the protective paint covering.  [Ex. "CC," p. 13].

In arriving at his opinion, Lorenzo admits that he relied exclusively on an "article" from *hunker.com* to determine the effects of HCL on paint. [Ex. "BB," p. 186:2-10].   Nevertheless,

this "article" is not from a scientific source, but rather a do-it-yourself home repair and design web site. [Ex. "JJ," pp. 1-2]. The article is also not based on any generally accepted scientific principles and was authored by Les Belzer, who lists his credentials as an author writing articles on "education, mathematics, and Spanish literature[]." *See* Les Belzer, "Acids to Remove Paint," https://www.hunker.com/12501856/acids-to-remove-paint (last visited June 13, 2019).

Dr. Lorenzo's reliance on this non-scientific article written by a non-expert completely undermines his opinion that the HCL cloud corroded the paint on the Burroughs buildings' side panels causing a 50% reduction of their useful life. Furthermore, Dr. Lorenzo conceded that he performed no actual calculations to reach the 50% loss of useful life. [Ex. "BB," pp. 187:19-188:5]. Lorenzo admitted he just "reckon[ed] that exposure to that paint would result in 50 percent reduction in lost life and . . . we don't know the formulation or anything [of the paint]." [Ex. "BB," p. 188:3-5; *see also* p. 189:22-23]. Moreover, Lorenzo performed no testing or sampling of the side panels to determine whether any paint had actually been corroded. Rather, he made a blind guess and picked a 50% number, which falls far below the threshold requirement for expert testimony.

Lorenzo's lack of actual calculations, and lack of facts to actually make those calculations, renders his opinion that the side panels lost 50% of their useful life unreliable testimony. *See Seaman*, 326 Fed. App'x at 725 ("The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion . . . .."); *see also Moore*, 151 F.3d at 279 (an expert's testimony cannot "leap[] from an accepted scientific premise to an unsupported one."). Moreover, the lack of factual basis for his conclusions renders his testimony irrelevant. *See*

9

*Classic Bldg. Design, LLC*, 2012 WL 3913090, at *12.

As set forth above, Dr. Lorenzo's opinion that the painted side panels on the Burroughs buildings have lost 50% of their useful life is not based on any scientific treatise or methodology, or his personal experience. Rather, the only basis he provides for his opinion that the paint has been corroded is based on a non-scientific web site that mentions muriatic acid. Because his opinion is based on non-scientific sources and not based on any reasonably accepted calculation method, it constitutes mere guesswork and is unreliable. The sourcing of the report and Dr. Lorenzo's own testimony establish that the opinion is not grounded in the methods or procedures of science, but rather is exactly the kind of unsupported speculation or subjective belief that should be stricken. *See Freehold Management, Inc.*, 2019 WL 1436659, at *4. As such, Dr. Lorenzo's opinion regarding the side panels' loss of useful life is due to be stricken.

**V.     Conclusion.**

Burroughs's experts' opinion that the HCL vapor was "smoke" is due to be stricken. Furthermore, Lorenzo's opinions that the metal side panels of all of the Burroughs buildings have lost 50% of their life and that the metal roofs thereof have lost 80% of their useful life are also due to be stricken. Lorenzo relies on speculation, conjecture, and unreliable methodologies in calculating the loss of useful life as to the roofs and the metal side panels of the Burroughs buildings.

WHEREFORE, PREMISES CONSIDERED, TIA respectfully requests that this Honorable Court enter an Order excluding the opinions and testimony as set forth above in this matter for the reasons set forth herein.

Respectfully submitted,

        s/Brenen G. Ely
Brenen G. Ely (Bar # 105795)
Susan H. McCurry (Admitted *Pro Hac Vice*)
Attorneys for The Travelers Indemnity Company of America

**OF COUNSEL:**
ELY & ISENBERG, LLC
2100-B SouthBridge Parkway
Suite 380
Birmingham, Alabama 35209
Telephone:     (205) 313-1200
Facsimile:     (205) 313-1201
bely@elylawllc.com
smccurry@elylawllc.com

        s/Tom Julian
C. Michael Ellingburg (Bar # 5496)
Tom Julian (Bar # 101905)
Attorneys for The Travelers Indemnity Company of America

**OF COUNSEL:**
DANIEL COKER HORTON & BELL, P.A.
4400 Old Canton Road, Suite 400
Post Office Box 1084
Jackson, MS 39211-1084
Ph: 601-969-7607
Fax: 601-969-1116
mellingburg@danielcoker.com
tjulian@danielcoker.com

## CERTIFICATE OF SERVICE

    I do hereby certify that a true and accurate copy of the foregoing has been served on all parties of record via the CM/ECF electronic filing system and/or U.S. Mail on this the 17th day of June, 2019.

Ken R. Adcock
ADCOCK & MORRISON, PLLC
P.O. Box 3308
Ridgeland, MS 39158

Matthew D. Miller
Nicholas K. Thompson
Copeland, Cook, Taylor & Bush, P.A.
P.O. Box 17619
110 Sheffield Loop (39402)
Hattiesburg, MS 39404-7619

Edwin S. Gault, Jr.
Spencer M. Ritchie
FORMAN WATKINS & KRUTZ, LLP
210 E. Capitol Street, Ste. 2200 (39201)
P.O. Box 22608
Jackson, MS 39225-2608

Albert S. Nalibotsky
Saltz Matkov P.C.
6805 Morrison Blvd.
Suite 470
Charlotte, NC 28211

W. Hugh Gillon, IV
UPSHAW, WILLIAMS, BIGGERS & BECKHAM, LLP
Post Office Box 3080
Ridgeland, MS 39158-3080

                                             s/Brenen G. Ely
                                             OF COUNSEL